UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

SECURITIES AND EXCHANGE COMMISSION,   )
                                      )
                      Plaintiff,      )
                                      )
v.                                    )
                                      )
ANDREW H. WILSON,                     )
                                      )
                      Defendant.      )
                                      )
_____)

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

**I.   INTRODUCTION**

1.   The Commission brings this action to enjoin Defendant Andrew H. Wilson ("Wilson") from violating the registration provisions of the federal securities laws. From no later than August 2011 through August 2013, Wilson performed legal services for Daniel McKelvey ("McKelvey") and Steven Sanders ("Sanders") (collectively, the "Control Persons") by, among other things, providing at least five legal opinion letters by which restricted securities of at least three blank check companies controlled by the Control Persons ("Blank Check Companies") were unlawfully allowed to be sold to the public.

2.   As a result of the conduct alleged in this Complaint, Defendant Wilson violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) and 77e(c).

3.   Unless restrained and enjoined, Defendant is reasonably likely to continue to violate the federal securities laws.

- 1 -

4.      The Commission therefore respectfully requests the Court enter an order: (i) permanently restraining and enjoining Defendant from violating the federal securities laws; (ii) permanently restraining and enjoining Defendant from directly or indirectly providing, or receiving compensation from the provision of, professional legal services to any person or entity in connection with the offer or sale of securities pursuant to, or claiming, an exemption under Section 4(a)(1) predicated on Securities Act Rule 144, or any other exemption from the registration provisions of the Securities Act, including, without limitation, participating in the preparation or issuance of any opinion letter relating to such offering or sale; (iii) directing Defendant to pay disgorgement with prejudgment interest; (iv) directing Defendant to pay civil money penalties; and (v) imposing a penny stock bar against Defendant.

## II.     DEFENDANT AND RELEVANT ENTITIES

5.      Wilson resides in Nevada City, California and is an attorney licensed in California who issued at least five legal opinions and provided other professional services in connection with at least four Blank Check Companies and by which restricted securities of at least three Blank Check Companies were unlawfully allowed to be sold to the public.

6.      Each of the Blank Check Companies was a "blank check" company as defined in Rule 419 under the Securities Act – that is, it was: a development stage company that had no specific business plan or purpose or had indicated that its business plan was to engage in a merger or acquisition with an unidentified company or companies, or other entity or person; and was issuing "penny stock," as defined in Rule 3a51-1 (17 C.F.R. § 240.3a51-1) under the Securities Exchange Act of 1934 ("Exchange Act"). Among other things, the securities of the Blank Check Companies were penny stocks because they were equity securities: (1) that were not an "NMS stock," as defined in 17 C.F.R. § 242.600(b)(47); (2) that traded below five dollars

per share during the relevant period; (3) whose issuer had net tangible assets and average revenue below the thresholds of Exchange Act Rule 3a51-1(g)(1); and (4) that did not meet any of the other exceptions from the definition of "penny stock" contained in Exchange Act Rule 3a51-1.

### III. JURISDICTION AND VENUE

7. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a).

8. The Court has personal jurisdiction over Defendant and venue is proper in this District because, among other things, Defendant transacted business in this District and/or participated in the offer or sale of securities in this District, and many of the acts and transactions constituting the violations alleged in this Complaint occurred in this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Commission's claims occurred here. For example, as more fully described below, Defendant prepared legal opinion letters for which he purportedly acted as special counsel to at least two Florida corporations (one with its stated principal place of business in this District). For at least three of those opinion letters, Wilson's "examination of law relevant to the matters covered by this opinion is limited to the Business Corporation Act of the State of Florida and the federal law of the United States." Wilson provided those legal services in furtherance of the efforts of the two Control Persons (one of whom resided and was located in this District at all material times), communicated with both Control Persons, and received payment for at least three of the opinion letters by wire transfer from an escrow agent located in this District per instructions of Sanders within this District.

9. In connection with the conduct alleged in this Complaint, Defendant, directly

and indirectly, singly or in concert with others, has made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## IV. FACTUAL BACKGROUND

### A. Overview of the Blank Check Companies

10. At all material times to this Complaint, McKelvey was a resident of Foster City, California and Sanders was a resident of Lake Worth, Florida. McKelvey and Sanders teamed up to control and sell at least four separate Blank Check Companies. McKelvey and Sanders have both pled guilty and been sentenced to terms of imprisonment in connection with their manufacture of the Blank Check Companies.

11. The following chart depicts the structure of these Blank Check Companies:

**CHART A – THE BLANK CHECK COMPANY STRUCTURE**

| Blank Check Company | State of Incorporation | Date of Incorporation | Date of Change of Control |
|---|---|---|---|
| Entertainment Art, Inc. ("Entertainment Art") | Nevada | 6/2007 | 10/2012 |
| BlueFlash Communications, Inc. ("BlueFlash") | Florida | 1/2011 | 6/2013 |
| mLight Tech, Inc. ("mLight Tech") | Florida | 9/2010 | 8/2013 |
| Big Clix Corp. ("Big Clix") | Florida | 6/2010 | 9/2013 |

12. The Blank Check Companies had no operations and no value other than (i) their registration status with the Commission, and (ii) a float of purportedly unrestricted (or "free trading") shares of common stock which, despite purportedly owned by approximately 24 shareholders, were all available for secondary sale by and for the primary benefit of McKelvey and Sanders.

13. Each Blank Check Company followed the same path to sale. A sole officer, director, employee, and majority shareholder (the "sole officer") was recruited to act in name only.

14. False and misleading registration statements (the "Forms S-1") were then filed with the Commission for purported initial public offerings of the common stock of the Blank Check Companies. The Forms S-1 (and subsequent Commission filings) falsely depicted the Blank Check Companies as actively pursuing business plans, when the only plan from the onset was to be sold as "public vehicles," "pubcos," or "shells."

15. Once the Forms S-1 went effective, the Control Persons solicited friends and family to invest in the Blank Check Companies, while keeping complete control over those investments through blank stock powers.

16. The Control Persons used many of the same friends and family (including themselves and their spouses) to develop a base of approximately 24 shareholders in order to pass regulatory muster for the shares to be cleared for quotations on public markets.

17. The Control Persons then consummated reverse mergers or other change-of-control transactions which included the bulk transfer of all the purportedly unrestricted shares of the Blank Check Companies. The Control Persons procured false legal opinions misstating that the shares of the Blank Check Companies in the names of the approximately 24 shareholders were unrestricted.

18. In the case of at least Entertainment Art and mLight Tech, the purchasers effectuated multi-million-dollar pump-and-dump schemes shortly after the changes of control by publicly selling the shares that had been incorrectly deemed as unrestricted in the legal opinion letters.

### B. Wilson's Involvement in the Fraudulent Scheme

19. Wilson, a securities lawyer for over 40 years, had previously been counsel to McKelvey on matters unrelated to the Blank Check Companies. From August 2011 to August 2013, Wilson performed legal services for McKelvey and Sanders by, among other things, submitting at least five opinion letters as to the unrestricted nature of the securities of three Blank Check Companies: Entertainment Art, BlueFlash, and mLight Tech.

20. Wilson was aware that McKelvey and Sanders were acting together in controlling the Blank Check Companies. For example, Wilson had attorney-client communications with both McKelvey and Sanders with respect to efforts to sell at least one Blank Check Company, Big Clix. On August 1, 2013, McKelvey copied Wilson and Sanders on an email to the buyer of Big Clix, referring to Big Clix as "the public vehicle" and Sanders as "my partner," and stating that he and Sanders "need to debrief with [Wilson]" about the proposed merger transaction.

21. McKelvey and Sanders needed Wilson's opinion letters in order to sell the Blank Check Companies, the primary feature of which was a deceptive public float of purportedly unrestricted securities based on the transactions meeting or being exempt from the registration requirements of Section 5 of the Securities Act. These opinion letters were critical to making the securities of the Blank Check Companies eligible for deposit with broker-dealers or otherwise available for public trading.

22. Wilson's opinion letters at issue are:

| Blank Check Company | Date of Opinion Letter | Addressee |
|---|---|---|
| Entertainment Art | 8/11/2011 | Issuer |
|  | 10/22/2012 | Issuer/Transfer Agent |
| BlueFlash | 6/3/2013 | Buyers |
| mLight Tech | 7/31/2013 | Broker-Dealer |
|  | 7/31/2013 | Broker-Dealer |

### 1. Entertainment Art

23. At the time of the first opinion letter in August 2011, McKelvey and Sanders had assumed control of Entertainment Art, and its most recent periodic report indicated that it was a "shell company" with David Lubin as its Treasurer, Secretary and Director, and Principal Financial and Accounting Officer. Lubin has been convicted of conspiracy to commit securities fraud in connection with Entertainment Art.

24. On August 9, 2011, McKelvey emailed Lubin (copying Wilson and Sanders): "You had requested a legal opinion for my stock purchase of [Entertainment Art]. Our legal counsel (Andy) [Wilson] needs to know specifically what you want him to opine on." Lubin responded to Wilson that the opinion letter should include the legal conclusion that "your client is not an affiliate of the company."

25. Also on August 9, 2011, McKelvey responded to Lubin (copying Wilson and Sanders) as to whether "you were working on selling the pub co. Is that correct? ... I just want to clarify so we don't step on each other if true." On August 10, 2011, Lubin responded (copying Wilson and Sanders): "[I]f you send me an LOI [Letter of Intent] including the material terms from the sale of one of your pubcos, I may have a potential buyer . . . so when can we expect the legal opinion so we can assist in processing your shares?" McKelvey responded (copying Wilson and Sanders): "The term sheet will be sent later today."

26. Despite receiving such emails indicating McKelvey's efforts – and authority – to sell Entertainment Art, on or about August 11, 2011, Wilson signed an opinion letter addressed to Entertainment Art and Lubin that McKelvey was not an "affiliate" of Entertainment Art and acquired 1,485,000 shares "for investment and not for resale, transfer or hypothecation or redistribution of the Shares." The opinion letter expressly stated that "it is required as a

condition of the deposit of the shares into a brokerage account."

27. On October 18, 2012, McKelvey emailed Wilson (copying Sanders) to provide "ASAP" a second opinion letter pertaining to Entertainment Art – specifically that shares designated as "restricted" on a shareholder list were in fact unrestricted.

28. Four hours after the request, Wilson sent an opinion letter addressed to Entertainment Art (care of its sole officer, Jeffrey Lamson, who was convicted of conspiracy to commit securities fraud in connection with the Blank Check Companies) and the transfer agent "concerning the availability of the safe harbor provided by Rule 144" under the Securities Act to Entertainment Art shares that were designated as "restricted" on a shareholder list. The shareholder list indicated that Entertainment Art had 26 shareholders, with the "restricted" shares issued between November 2007 and February 2011.

29. In the October 2012 opinion letter, Wilson addressed various provisions of Rule 144, however, Wilson failed to address whether Entertainment Art was a shell company for purposes of Rule 144(i). In fact, all of Entertainment Art's periodic reports from December 31, 2008 to the time of Wilson's opinion letter indicated that Entertainment Art was and remained a "shell company." Moreover, Wilson failed to address whether any of the shareholders were "affiliates" or the securities were "control securities," despite the fact that McKelvey and Sanders were effectuating the bulk sale of these shares.

30. Still that same day, McKelvey asked the transfer agent to "confirm this [Wilson's opinion letter] is sufficient for you to remove the legend when the certs are re-cut." After the transfer agent confirmed that Wilson's opinion letter was acceptable, McKelvey and Sanders told the buyer's counsel: "Ok, we're good to go. Please make arrangements to wire the funds."

31.     Entertainment Art publicly announced a change of control on the same day as Wilson's October 18, 2012 opinion letter and soon thereafter changed its name to Biozoom, Inc., which was the subject of a fraudulent pump-and-dump with public sales of the shares addressed in Wilson's two opinion letters beginning in May 2013.

32.     Beginning on October 22, 2012, a lawyer located within this District distributed approximately $325,000 in proceeds from the sale of Entertainment Art, including a wire transfer to Wilson for $1,500 as compensation for his legal opinion letters in connection with Entertainment Art.

### 2.  BlueFlash

33.     In mid-2013, McKelvey and Sanders retained Wilson to submit opinion letters to or for the buyers of two other Blank Check Companies, BlueFlash and mLight Tech. Both BlueFlash and mLight Tech were Florida corporations, and mLight Tech's stated principal place of business was within this District.

34.     Wilson's BlueFlash opinion letter was dated June 3, 2013, and stated that he was "serving as special counsel to BlueFlash" relating to the "sale of certain shares of common stock of the Company" per stock purchase agreements between two buyers and 24 sellers. The two buyers and 24 sellers were listed by name on an attached schedule, which also noted that the two buyers were collectively purchasing 1,200,000 shares.

35.     Wilson's opinion letter stated that he was familiar with the stock purchase agreements and BlueFlash's Commission filings, and had reviewed such other documents as the Form S-1 and "stock powers." The stock purchase agreements explicitly stated:

> [S]everal Stock Purchase Agreements of like tenor hereto ("Stock Purchase Agreements") are being entered into between stockholders, including Seller (collectively, the "Sellers"), holding, in the aggregate (including the Shares), at least 1,200,000 shares of Common Stock (the "Minimum Aggregate Sale") and

prospective purchasers of such shares, including Buyer (collectively, the "Buyers").

36. The stock purchase agreements also identified McKelvey by name as the "Sellers' Representative," and stated that each seller "is indifferent as to which of the Buyers is party to this Agreement as the Buyer hereunder." Wilson was familiar with the stock purchase agreements (as represented in the opinion letter), and thus was aware of the bulk sale of 1,200,000 of BlueFlash shares by all 24 sellers (with McKelvey acting as their collective representative) without regard for which of the two buyers was purchasing their shares.

37. Furthermore, BlueFlash's most recent Commission filing (the Form 10-K filed on March 21, 2013), stated that "As of January 31, 2013, there were 10,200,000 shares of the issuer's $0.0001 par value common stock issued and outstanding" comprised of 9,000,000 shares in the name of the sole officer and "1,200,000 shares of common stock [sold] to 24 shareholders pursuant to a Registration Statement filed with the [Commission]." Wilson was familiar with the Commission filings (as represented in the opinion letter), thus he was aware that the transaction at issue in his opinion letter constituted the bulk sale of all of BlueFlash's purportedly unrestricted shares (1,200,000).

38. Despite all this purported familiarity with the nature of the transaction, Wilson's BlueFlash opinion letter concluded that the shares were part of a registered offering per the Form S-1, and that the shares "are, and when transferred to the Buyers pursuant to the [stock purchase agreements] will be, unrestricted and free-trading shares." Wilson erroneously concluded that the shares were "freely tradeable" or "registered" given the fact that every transaction in securities has to be registered or exempt from the registration requirements. In other words, Wilson failed to distinguish between the shares themselves and transactions in those shares (given that the registration requirements of the federal securities laws are transaction-specific).

- 10 -

Wilson also failed to distinguish between the initial "sale" which had been part of the purported Form S-1 offering, and the subsequent bulk sale of those shares which was the subject of the BlueFlash opinion letter and which was not registered or exempt from the registration requirements of the federal securities laws.

39.  Wilson's BlueFlash opinion letter also misstated the factual basis of his conclusions. The BlueFlash opinion letter stated:

> We are familiar with the sellers and/or with the principals of the company who are familiar with the sellers. We and/or such principals have knowledge of the sellers' desire to sell the shares, and that the sellers are each familiar with the terms and conditions of the transactions contemplated by the [stock purchase agreements].

The BlueFlash opinion letter also stated that Wilson based his conclusions on his "substantive involvement in the representation of the Sellers and the Company in connection with these transactions."

40.  To the contrary, Wilson was not familiar with any of the sellers (except Lamson, who was the sole officer of Entertainment Art and the addressee of Wilson's October 2012 opinion letter), and made no determination whether they were "affiliates." The BlueFlash shareholders also included McKelvey's wife and Sanders' children. Wilson was also not familiar with the sole officer (i.e. the only publicly identified "principal") of BlueFlash. Wilson, despite purportedly reviewing the Form S-1, was not aware that the sole officer of BlueFlash had been replaced since the time of the Form S-1.

41.  Wilson's BlueFlash opinion letter further states that "[a]ny factual assumptions are based upon the representations of the Sellers and the documents that they have provided." To the contrary, none of the Sellers made any representations or provided any documents to Wilson.

42. Wilson received payment for his work in connection with BlueFlash on June 5, 2013 from another lawyer in this District via wire transfer per Sanders' instructions.

43. On June 26, 2013, BlueFlash announced a change-of-control transaction per the filing of a Form 8-K with the Commission.

44. Wilson's BlueFlash opinion letter led to public sales by the buyers of the shares beginning in October 2013.

### 3. mLight Tech

45. Soon thereafter, Wilson prepared two virtually identical letters for McKelvey and Sanders in connection with mLight Tech. These two opinion letters were also substantially similar to the BlueFlash opinion letter both in form and substance regarding the bulk sale of all purportedly unrestricted shares in the names of 24 shareholders to a few buyers.

46. Wilson's mLight Tech opinion letters were dated July 31, 2013, and stated that he was "serving as special counsel to mLight Tech" relating to the sale of "certain shares of common stock of the Company" pursuant to two stock purchase agreements. Each mLight Tech opinion letter pertained to one of the two stock purchase agreements.

47. Wilson's mLight Tech opinion letters stated that he was familiar with the stock purchase agreements and mLight Tech's Commission filings. The two stock purchase agreements, which McKelvey emailed to Wilson along with blank stock powers on July 30, 2013, were virtually identical. Each agreement was between a Belize entity and 12 sellers (identified by name on signature pages) for the collective sale of 11,500,000 shares of mLight Tech common stock for $24,000. Across the two agreements, 23,000,000 shares of mLight Tech common stock were together being sold at the same time at the same price.

48. Wilson was familiar with the stock purchase agreements (as represented in the

opinion letter), thus he was aware of the bulk sale of 23,000,000 of mLight Tech shares at the same price to two Belize buyers.

49. Furthermore, mLight Tech's most recent Commission filing (the Form 10-Q filed on May 7, 2013), stated that it had the same exact capital structure as BlueFlash except for a 20-to-1 forward stock split – that is, it had 204,000,000 shares outstanding with 180,000,000 shares in the name of the sole officer and 23,000,000 other shares of common stock. Wilson was familiar with the Commission filings (as represented in the opinion letter), thus he was aware of the bulk sale of all of mLight Tech's purportedly unrestricted shares (23,000,000) to just two buyers (both from Belize) per identical stock purchase agreements.

50. Wilson's mLight Tech opinion letters then state that the shares were part of a registered offering per the Form S-1, and that the shares "are, and when transferred to the Buyers pursuant to the [stock purchase agreements] were, unrestricted and free-trading shares." Wilson also based this conclusion on "substantive involvement in the representation of the Sellers and the Company in connection with these transactions." To the contrary, Wilson had no communications or familiarity with any of the Sellers and made no determination whether they were "affiliates." Moreover, Wilson erroneously concluded that the shares were "freely tradeable" or "registered" given the fact that every transaction in securities has to be registered or exempt from the registration requirements. In other words, Wilson failed to distinguish between the shares themselves and transactions in those shares (given that the registration requirements of the federal securities laws are transaction-specific). Wilson also failed to distinguish between the initial "sale" which had been part of the purported Form S-1 offering, and the subsequent bulk sale of those shares which was the subject of the mLight Tech opinion letters and which was not registered or exempt from the registration requirements of the federal securities laws.

51.     Wilson's mLight Tech opinion letters further state that "[a]ny factual assumptions are based upon the representations of the Sellers and the documents that they have provided."  To the contrary, none of the Sellers made any representations or provided any documents to Wilson.

52.     Wilson also received copies of blank stock powers purportedly executed by the mLight Tech nominee shareholders, who were all purportedly selling their shares simultaneously to the two Belize buyers under the exact same contractual terms.

53.     Wilson's mLight Tech opinion letters were dated July 31, 2013.  However, on August 5, 2013, McKelvey emailed Wilson: "[O]n the mLight opinion, the broker has requested that you modify the opinion to state the 'S1 is effective.'  This will allow the shares to clear.  Can you update both opinions, sign, and send back.  This is the ONLY change required to close this issue.  Thanks."

54.     On August 6, 2013, Wilson sent McKelvey the "revised" opinions which McKelvey immediately forwarded to the mLight Tech buyer's representative.

55.     The following day, on August 7, 2013, mLight Tech announced a change-of-control transaction per the filing of a Form 8-K with the Commission.

56.     McKelvey paid Wilson for his two mLight Tech opinion letters in August 2013.

57.     The mLight Tech shares that were the subject of Wilson's two opinion letters were publicly sold beginning on August 28, 2013.

58.     Wilson's BlueFlash and mLight Tech opinion letters did not analyze the applicability of any exemptions to the registrations requirements of the federal securities laws, including the safe harbor provision under Securities Act Rule 144.  Specifically, Wilson did not address whether any of the shareholders were "affiliates" and whether BlueFlash or mLight was

a shell company for purposes of Rule 144(i).

59. When Wilson wrote each of the 5 opinion letters, he was in possession of information that it was, under the circumstances, unreasonable for him to rely upon without further inquiry. At all relevant times, Wilson knew, was reckless in not knowing, or should have known, that McKelvey, Sanders, and all of the shareholders were affiliates of the Blank Check Companies.

### 4. Big Clix: Wilson's Involvement at the Time of the mLight Tech Opinion Letters

60. Prior to and at the time of the two mLight Tech opinion letters finalized by Wilson on August 6, 2013, Wilson acted as legal counsel at the direction of McKelvey and Sanders in connection with the sale of another Blank Check Company, Big Clix. Wilson knew, was reckless in not knowing, or should have known that, like BlueFlash and mLight Tech, McKelvey and Sanders were working together to sell in bulk all of the "free-trading" shares of Big Clix (which was referred to as the "public vehicle" and "shell" on emails received by Wilson prior to the mLight Tech opinion letters) in the names of 24 shareholders to a few buyers.

61. Documents in Wilson's possession indicated that mLight Tech and Big Clix had the same number of shareholders and five common shareholders, including Sanders' children.

62. Wilson understood that McKelvey, who was not a named officer, director or majority shareholder, had the authority to negotiate and effectuate the sale of Big Clix by reverse merger.

63. Wilson also received communications and draft merger documents evidencing that McKelvey and Sanders were effectuating the sale of all 100% of the shares of Big Clix, including all its purportedly unrestricted shares. For example, on June 27, 2013, McKelvey sent Wilson and Sanders an email with an attached set of merger agreements, including a "Form of

FT [free-trading] share sell/purchase agreement to be used for 15,300,000 shares – from the [Big Clix] shareholders to the [buyer's] designees," a cancellation agreement by which all 156,000,000 restricted shares in the name of the sole officer would be canceled for no consideration, and a merger agreement by which McKelvey would personally indemnify the buyer.

64.     Wilson had numerous substantive communications with McKelvey, Sanders and the buyer's counsel on these agreements and other aspects of the merger, including:

- July 1, 2013: Buyer's counsel emailed McKelvey and Wilson that "the best way to work the share sale is through a joint sale agreement from the 24 shareholders to the two buyers" with all the "FT [free-trading] shares" being transferred "when you [McKelvey] would be getting your $250,000."

- July 3, 2013: McKelvey sent Wilson a draft escrow agreement "for the FT [free-trading] shares" of Big Clix. The escrow agreement provided that "15,300,000 of the free trading shares" of Big Clix would be sold for $20,000, whereas Wilson was already aware that McKelvey would receive approximately $250,000 in connection with the Big Clix merger.

- July 9, 2013: Buyer's counsel wrote to Wilson that, given concerns with the transfer of all the "free trading" shares, the buyer "holds back his payment on behalf of the company to Daniel [McKelvey] (i.e. the $245,000) until the shares are fully delivered. All of the free trading shares will be delivered at the same time." Wilson responded to the buyer's counsel that "Daniel [McKelvey] would be paid" at the time the transfer agent effectuates the transfer of the shares after the closing of the merger.

- July 10, 2013: Buyer's counsel emailed Wilson: "Here is a series of letters that we might use to move the shares, once the Closing +3 is achieved." Attached was a draft "Joint Stock Transfer Instruction From Daniel McKelvey and [buyer]" addressed to the transfer agent by which McKelvey would have the authority to order the transfer of shares "from the twenty-four shareholders of Big Clix . . . that are parties to the Joint Inter-Shareholder Common Stock Purchase Agreement" to two buyers. Pursuant to that agreement, the 24 Big Clix shareholders (the same number as mLight Tech) would sell their "free trading" shares by delivering blank stock powers "contemporaneously with" the consummation of the reverse merger to just two buyers (the same number as mLight Tech), upon the joint instructions of McKelvey and one of the buyers.

- August 1, 2013: McKelvey emailed the buyer (copying Wilson) that he had

asked Wilson and the buyer's counsel "to connect yesterday and I believe they did. I just need to spend some time with [Wilson] to understand the options and position here" with reference to Big Clix as "the public vehicle": "[M]y partner [Sanders] is traveling today to the W[est] C[oast], and we need to debrief with [Wilson] when [Sanders] arrives."

- August 2, 2013: Buyer emailed McKelvey (copying Wilson) about a proposed restructuring of the deal by which "we can carve up some more shares to make it better. Need your go ahead. The shell has issues now – no matter what, at least [this] brings in some money now."

- August 2, 2013: Wilson emailed the buyer's counsel about the draft Form 8-K for the postponement of the merger, and proposed that the filing could state "that the parties have agreed to extend the date (which Daniel [McKelvey] and buyer would have to agree on)," and separately corresponded with McKelvey and Sanders regarding the draft Form 8-K.

- August 5, 2013: Buyer's counsel responded to Wilson's August 2, 2013 message that "I would leave the agreement where [the two buyers] are to buy the shares from the 24 in place" and "we can figure what to do with the free shares" depending on other aspects of the deal. Wilson separately corresponded with McKelvey and Sanders that same day. The buyer's counsel again responded to Wilson: "The agreement for the purchase of the FT [free-trading] shares is contingent on the 'consummation of the merger transaction ....'"

65.     The following day, and with all this knowledge of McKelvey and Sanders' control over the sale of all the purportedly unrestricted shares of Big Clix from 24 sellers to two buyers (by which McKelvey would be paid the vast majority of the proceeds), Wilson sent McKelvey his "revised" mLight Tech opinion letters erroneously concluding that the similar sale of all the shares of mLight Tech from 24 sellers to just two buyers involved unrestricted securities.

## COUNT I

### Violations of Sections 5(a) and 5(c) of the Securities Act

66.     The Commission repeats and realleges Paragraphs 1 through 65 of its Complaint.

67.     Wilson, directly or indirectly, has made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, when no registration statement was in effect with the Commission as to such securities, and has made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell such securities when no valid registration statement had been filed with the Commission as to such securities.

68.     There were no applicable exemptions from registration.

69.     By reason of the foregoing, Wilson violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a), (c).

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find Wilson committed the violations alleged, and:

### I.
### Permanent Injunction

Issue a Permanent Injunction restraining and enjoining Wilson, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him, and each of them, from violating the federal securities laws alleged in this Complaint.

## II.
## Conduct-Based Injunction

Issue a Permanent Injunction restraining and enjoining Wilson from directly or indirectly providing, or receiving compensation from the provision of, professional legal services to any person or entity in connection with the offer or sale of securities pursuant to, or claiming, an exemption under Section 4(a)(1) predicated on Securities Act Rule 144, or any other exemption from the registration provisions of the Securities Act, including, without limitation, participating in the preparation or issuance of any opinion letter relating to such offering or sale.

## III.
## Disgorgement

Issue an Order directing Wilson to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## IV.
## Penalties

Issue an Order directing Wilson to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

## V.
## Penny Stock Bar

Issue an Order, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), barring Wilson from participating in any future offering of a penny stock.

## VI.
## Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VII.

## Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action and over Wilson in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.


Dated: October 11, 2017                     Respectfully submitted,

                                     By:    /s/ Christine Nestor
                                            Christine Nestor
                                            Senior Trial Counsel
                                            Florida Bar No. 597211
                                            Direct Dial: (305) 982-6367
                                            E-mail: Nestorc@sec.gov
                                            *Lead Attorney*
                                            *Attorney To Be Noticed*


                                            ATTORNEY FOR PLAINTIFF
                                            SECURITIES AND EXCHANGE COMMISSION
                                            801 Brickell Avenue, Suite 1800
                                            Miami, Florida 33131
                                            Telephone: (305) 982-6300
                                            Facsimile: (305) 536-4154